The next matter, number 221674, Jack Owens et al. v. City of Malden. At this time, would counsel for the City of Malden please introduce himself on the record to begin? Good morning. Barry Miller of Seyfroth Shaw on behalf of Appellant City of Malden. And with me are my partner, Allison Silvera, and our colleague, Tim Buckley. I'd like to reserve two minutes for rebuttal, if I may. You may. Thank you. I won't belabor the factual background of the case, but I will provide some framework. Ultimately, what we're talking about here is a lawsuit brought by about 110 City of Malden police officers who were paid $378 an hour, or up to that amount, for working police details. And that's a rate that they set themselves through a detail board, which was a committee composed entirely of union officers. Notwithstanding that nosebleed $378 top rate, these plaintiffs sued, claiming that they'd been underpaid for performing police details. And the crux of the party's dispute boils down to one phrase in the collective bargaining agreement, which defines the rate at which details are to be paid. And what it says is, details are to be paid at the maximum patrolman's rate of pay, including night differential. That is the pivotal phrase in this case. In setting the rate, the detail board did not, as we contend the contract requires, begin with the base salary of the highest paid officer and add night differential. Night differential is, in fact, one of about half a dozen augments that officers can earn in addition to their base salary. Others include Quinnville educational benefits, longevity pay, hazardous duty pay, that sort of thing. Let me just interrupt you to understand one little thing before you keep going. So they interpreted maximum patrolman's base pay as the base pay of the highest paid patrol officer? They interpreted the whole phrase in setting the rate to include not only base pay, plus night differential, but base pay, plus night differential, plus Quinnville benefits, plus longevity, plus hazardous duty. I understand that. I'm just talking about the first piece of the base pay is based upon the maximum base pay. I mean, I would imagine that if there's a seniority system, that officers have different base pays depending on. And that part is not really in controversy here. We agree as to the highest paid officer in terms of the salary. The dispute is about what is added to that base salary to derive the detail rate. The contract specifies night differential specifically. That is the one and only augment that it does specify in defining the detail rate. And there's a very clear maximum of contract construction that tells you when you have a list of things that could be added. And it's enumerated in the agreement as it is here. And we have hazardous duty pay. We have Quinnville benefits. We have all of these things that officers could earn in one place in an agreement. And you set out a contractual phrase that picks from that list. And in that contractual phrase, you include only one of those elements. What the expressio unius exclusio ulterioris doctrine tells us is that by picking that one augment, you've deliberately excluded the others. That is a solid maximum of contract interpretation. And one thing that's critical. Except that the district judge, the district judge who's the fact finder here, says that night differential is different, that the list is not uniform. That, Your Honor, was a clear error. Well. And in fact. That's what you've got to convince us on. Moreover, what you want us to interpret the phrase is, maximum patrolman's rate of pay plus night differential. But that's not what it says. That's correct. It could have said that. It says including. When it says including, my first thought is, well, what else does it include? Well, that's what the expressio unius doctrine tells us we're not allowed to have. I'm not sure the expressio unius applies when you use the word including in place of a word like plus. But in any event, if the district court's differentiation stands up, we never have to reach the problem you're presenting. And the district court's differentiation cannot stand up. The district court's differentiation is based on an observation that Judge Young crafted out of whole cloth. He divides these various augments, these half dozen categories of pay, into some that are asserted to be personal to the officer based on their characteristics. For example, having completed certain educational thresholds on the one hand, and those that are situational and based on the work that the person is doing. He calls them conditional. So for example, hazardous duty pay or night shift differential would be conditional because you're getting that based on the circumstances present when you're doing this work. And in the fact finding that Judge Selya just references, Judge Young noted that there's no consistency in this paradigm. Night shift differential is a conditional augment because you only get it if you're working the night shift. Similarly, he notes in a footnote that hazardous duty pay is conditional. But he doesn't explain why we would include one of those elements, night differential, in expositing this raid, but not the other. Isn't the difference obvious? I mean, if a duty is hazardous, then every patrolman who reports for the duty is going to be entitled to the augment. But every patrolman who reports for the duty is only entitled to night differential if his shift happens to involve a certain time period. I mean, to me, the difference between the two is obvious. Neither of those are factually true. Night shift differential is just based on the shift to which you're assigned. Yeah, that's right. And hazardous duty pay is paid across the board to officers in general. But once the work, the private detail, involves hazardous duty, everybody is going to get it. There's no such scrutiny. There's no examination of whether a detail involves hazardous duty. The officers just get it for working. But let's back up from that division. Well, what do you mean the officers just get it? In other words, they get it on every assignment? Yes. Well, then Judge Young is right. There is, night differential is different. He called it conditional. Yeah. And there's nothing in the record, we should back up, because there's- All right, you're telling me hazardous duty isn't conditional. So that- Judge Young found it was. Excuse me. So a patrolman who reports to a private detail, so I understand this correctly, gets every augment on every shift, except that he only gets night differential on certain shifts. Not true. Okay, what's wrong with that? If an officer is assigned to a shift that includes early or late shifts, he gets the night differential on all of his pay, even if he's working during the daytime. Okay. But there's a point we're missing in discussing this fine distinction, which is that that distinction is made up out of whole cloth. It does not appear in the contract. There's no distinction between personal and conditional augments. There was no witness who even- Isn't that what happens when contracts are ambiguous? Well, no. I think we're jumping over several steps here, because Judge Young admitted parole evidence to determine whether the contract was ambiguous. That was the first error, because it is quite clear that whether a contract is ambiguous is a question of law for the court, and has reviewed de novo before this court. Judge Young thrice, at least, announced a conclusion based on the contract alone that it was unambiguous. He said that over and over in the record. Then, when he heard testimony, which he mischaracterized in his ultimate memorandum and order, in fact, the witnesses testified to the exact opposite of the points that Judge Young attributes to them, he then concludes, based on that testimony, that the contract was ambiguous. That was an error of law. Parole evidence should never have been admitted on that question. Judge Young not only announced that he believed the agreement was unambiguous repeatedly, he excluded parole evidence based on our objections until he didn't. And it's quite clear from his opinion. Before we get to exclusion of evidence, take this one step at a time, all right? I agree with you that the question of whether a contract is ambiguous is a question of law for the court. I read this phrase, the disputed phrase in this case, and I think a fair-minded person, in my judgment, could come to one of two conclusions. I think a court could consider this phrase unambiguous, but if it considered it unambiguous not in the way that you suggest, unambiguous in the way that the patrolman suggests, or I think it is possible that you could consider the phrase ambiguous, mainly because of the including night differential language. And if that's so, you would have to admit parole evidence. But you want us to consider the phrase unambiguous as inserting the word base into the phrase, meaning maximum patrolman's base rate of pay, including only night differential. Yes, Your Honor, and there's a syllogistic reason that that has to be the case, which we haven't addressed yet. The same phrase that we've been talking about, maximum patrolman's rate, including night differential, is also used to define another category of pay in the collective bargaining agreement, namely court time, exact same locution. A separate provision of the collective bargaining agreement provides for the inclusion of Quindle benefits in court time for officers that are entitled to them. What that tells us is that the drafters of this contract, when they wanted to include all of these other augments, they did so specifically. And Judge Young's conclusion and plaintiff's position that the phrase is unambiguous in the way that benefits them, means that that phrase, maximum patrolman's rate, including night differential, means something different in the context of detail pay than it means in court time pay. That's another maxim of statutory construction that Judge Young's opinion violates. It simply cannot stand. There's no logical reason that that same phrase could mean two different things. And we see that also in the exposition of the overtime rate, where these parties wanted to include a bunch of augments in any given rate, they did so specifically. When they defined overtime, they said, overtime will include all of the following, night differential, hazardous duty, Quindle benefits, all of the things that the detail board put into the detail rate, despite the fact that that language is not in the relevant provision of the contract. So for there to be an ambiguity, you have to have two competing interpretations of the agreement, both of which are viable. And both the interpretation that plaintiffs have offered and the interpretation that Judge Young reached are inviolable for that reason alone. It's a syllogistic argument. And there's no explanation. I really don't think inviolable is the word, but I get your meaning. I'll just stick with syllogistic. There's no way that the plaintiff's construction of this can stand. And if that construction is not viable, there's no competing construction to the one that Judge Young acknowledged to be unambiguous and viable. And the only thing you can do is apply the contract in its unambiguous way to treat this phrase as base salary plus night differential and nothing else. That's plainly what the unambiguous contract requires. But there's another very important point, which is that to the extent it were possible to conclude that this contract is ambiguous, and there was a clear factual error in reaching the conclusion that it was ambiguous, Judge Young found that both Controller Chuck Rannigan and Chief of Police Mollis testified that they believed this phrase that we've been talking about included all of these arguments. But if you look at the cited testimony, that is not what they said. They described how the rate empirically had been calculated by the detail board, which does include all of those arguments. But Controller Rannigan specifically said that's not what the contract provides. He very specifically said at page 922 of the record that the reason in his own calculations of the detail rate he did not include all of these other arguments was that the contract didn't call for that. The contract called for night differential only. But Judge Young interprets that testimony as Controller Rannigan saying that the contract contemplated this fully loaded rate. It's simply not what he said. Also true of Chief Mollis. Chief Mollis disclaimed any interpretation of the contract and said he hadn't even read the entire thing. That's at Record Appendix 983. And he said he didn't know. There were several other witnesses who testified to that effect, weren't there? No. I thought the mayor testified to that effect. Judge Young's finding was based on those two witnesses' testimony alone. See, I'm out of time. That's the way, all right. I'll read that portion of Judge Young's opinion because I don't recall it quite the way he stated. Even though he didn't cite the mayor, did the mayor testify to the contrary? The mayor testified about the implementation of the 10% administrative fee that Judge Young found to have been collected from the officers. That, too, was a clear factual error as described in our briefs. But the mayors, two mayors testified, in fact. The original mayor who instituted this and then the current mayor at the time. Neither of them had anything to say about the interpretation of the contract. Their testimony was limited to the city's collection of this fee outside the calculation of the detail rate. I will reserve the rest of my time.  Thank you, Counsel. At this time, would Counsel for Owens et al please introduce himself on the record to begin. Good morning, Your Honors. Joseph Podolsky for the plaintiffs. May it please the Court. I want to address a few points raised by my brother before I get into my argument. First, what I heard was essentially factual arguments. But what I didn't hear was my brother applying the appropriate standard to those factual arguments. Basically saying the judge is wrong here where he made this factual determination or the judge is wrong there where he made this factual determination. But your brother did say that Judge Young specifically relied on certain witnesses who did not testify to what Judge Young said they testified. He did, and I will address that. And that's really the only time at which he says that there's no evidence to support the judge's finding. He also said contract interpretation is a matter of the law for the Court, which means we review it de novo. Correct, no, that's a different issue and I plan on addressing that in my argument, Your Honor. The, on the factual argument point, though, what my brother needs to show is that there was no evidence to support the judge's findings. Not that he disagrees with the findings when there's evidence to support those findings. And he hasn't done that. And I'll get into it specifically. But he started with the basic proposition that as a matter of law, there's no ambiguity. And if there's no ambiguity, then you stop there and simply implement the unambiguous terms of the contract. Sure, and we don't disagree on the principle of law at all. And certainly when the trial started, the beginning days of the trial, we were arguing the same principle of law. We were arguing that there's no ambiguity in the contract for the exact reason that Judge Selya just described. The phrase, the maximum patrolman's rate of pay, it's very clear. And as Judge Selya said, it doesn't say. Well, what does that mean to you? Because it wasn't, even that wasn't clear to me, which is why I asked your brother counsel what it meant. That means that it's the rate of pay of the highest paid patrolman, including night differential. And that's where we get into the judge's findings in terms of the night differential being a conditional augment. And that's not even something that the city even disputed, necessarily. And I'll jump forward in my argument and get into that specifically. What the city argues is expressio unius. But, and I looked at this Latin phrase in preparing for today. What they're really arguing is a phrase that I'm going to butcher. It's called mutatis mutandis followed by expressio unius, which is essentially to say, if you change the language, then it's clear. Because what they've done in all of their papers is to change the first part of Article 23, Section 3, and then argue, and then if you look to the second part, that shows you that expressio unius applies. But they don't get to that argument unless they change the first part, which is what they do, what they've done consistently throughout the trial and here before this court. And that argument, that argument the city makes didn't come up until my brother was retained by the city, which was very shortly before trial. And I'll point your honor specifically to essentially all of the motion work and the trial brief, the joint trial brief that was filed prior to the trial in this case. So are you finding the ambiguity in the word including? Certainly you could. I mean, you're arguing ambiguity. I'm trying to figure out where you're saying the ambiguity lies. I think it's reasonable to make that assumption. We were arguing that it's unambiguous for the reasons that Judge Selya explained. And one of the reasons for that is essentially because, and I'll list them specifically for the court, actually my papers do, but all of the specific quote unquote arguments that my brother refers to, that's not how the contract actually refers to them. The contract refers to those different items as base salary. And that's the way that the parties have viewed this, not just because that's what the contract says, that is what the contract says, that these quote unquote arguments are base salary, but because that's part of an officer's regular compensation, part of an officer's regular rate of pay. And I would submit to you, your honor, that that's exactly why prior to their retention of their current counsel, that's the way it's worked for 40 plus years. And that's why their prior counsel entered into the following stipulation in the trial brief submitted to the court prior to trial regarding the phrase, the maximum patrolman's rate of pay. That is, quote. So that in the practical world how this applies, an officer, for instance, who doesn't get an educational benefit, if they are dispatched to a particular detail, that even though that officer doesn't get the benefit, he would get the benefit of a private entity paying that officer more than he would be entitled to as a police officer. Sort of, but not quite, your honor. Foundationally, the detail operation is a functional municipal ordinance and the orders of the chief of police, that's in the evidence. Those details exist for things like, and we all see it, road work. I understand, but if he was doing non-detail work, he wouldn't get the benefit of educational supplement or augment or however you want to include it, whereas if he was doing a private detail or she was doing a private detail, she would. Right, in that theoretical, yes, because the detail rate is a premium rate set by the contract. And so it's essentially to say when you're hiring a detail, this is the one rate that applies. So that when people are ordering details for things like, or really like when National Grid orders a detail for road work or down to electrical line, it's not an officer by officer number. It's what's the detail rate. And really, that detail rate is described in the agreement, which is the maximum patrolman's rate of pay, including night differential. And I want to get back to the stipulation because this stipulation was entered into by the city and came about specifically because during the course of this litigation, I sent a 30B6 notice and I asked the city to identify the person with the most knowledge on the contract. And despite what my brother says about, excuse me, the chief trying to discredit the chief now after the fact that the city named him as the person with the most knowledge. And he gave this testimony, which the city then stipulated to in their trial brief. The guy that I'm aware of is the highest paid police officer and there are different things that have been acquired over the years that have been part of the calculation. Things like Quinnbill, things like longevity. So what they all are, I don't know what they all are specifically, but I do know that they're all combined as ingredients to a final product for want of a better word in calculating the final detail rate. Explaining that which we've all known, including the city itself for the existence, the 40 plus year existence of the private detail program, which is the phrase, the maximum patrolman's rate of pay includes all items of regular compensation that go into the highest paid police officer's rate of pay. And we get, so that's what we, when we say it's unambiguous, we say it's unambiguous because it's very clear what rate of pay means. In fact, every First Circuit and mass state law case on the issue of rate of pay explains, and my brother cites these, but doesn't explain the actual holdings of the case in his papers, explains specifically that rate of pay includes all items of regular compensation divided by the number of hours. How do you contend with the argument that the appellant makes that the public and private rate paid to the officers is the same? So that, I think, Your Honor, proves our point because the trial evidence showed very clearly what I've just described. If you look at a paycheck from the time period of the highest paid patrolman, and then you look at the rate invoiced, you see it correlates perfectly. And then what the city was doing, and this is in the evidence, was taking 10% off of the top of that rate as opposed to adding that 10%, which is what's required by Chapter 44, Section 53C. So they take the 10% off, and what was happening, and this is in the trial record, what was happening is the city departments were saying, well, we shouldn't be paying this 10%, so that what they did was they just, they kept the same 10% rate off of the top, but they only charged the internal departments the rate less 10% off. I'm not sure that's the argument. I understand that, I understand your answer, but is that the argument you're making in your brief? That it's a calculated, that it should be calculated differently? I'm not suggesting it should be calculated differently than what I've explained. What I'm saying is that the city departments basically said we're not gonna pay ourselves the 10%, and so the officers still got the rate less 10%. They just were not invoicing the full rate to the city departments because of that internal decision not to move money from department to department at 10% increments, and that's reflected in the intercity emails, and specifically, and this is where I wanna address one of Judge Thompson's points, specifically in control of Rannigan's testimony,  I'm not gonna read the testimony in full, but I'll point the court specifically to record appendix page 819 to 824, record appendix 888 to 889, and 949 to 950, and what's clear in control of Rannigan's testimony is that he confirms that the rate, one, he confirms in an email, interdepartmental email, specifically addressing the question your Honor asked, with Tony Gertz essentially saying what's the rate, and a lot goes into that question in a case like this, but this was prior to trial. This was just a private interdepartmental city email, and Tony Gertz asks, you know, what's the rate that we're supposed to be paying, talks about the 10%, should we really be paying the 10%, and it's control of Rannigan who's responsible in testifying, who's responsible for the accuracy of payroll, accuracy of payroll includes the accuracy of detail, pay, he says the rate is, and he confirms, I don't remember the specific dollar amount, but he confirms that the rate is the exact amount that correlates to everything that I've been saying, everything that the city has been following forever, for 40 plus years, he confirms that rate, confirming the accuracy of that rate. He confirms in real time, not in a trial setting, that it's tied to the rate of pay of the highest paid patrolman, including all regular compensation, which is then confirmed in the testimony that I've pointed your honors to, and he confirms that the city was deducting, not adding the 10% administrative fee. The other thing that I want to point your honors to, and I do this in the brief, but, is he confirms that he never disapproved of payroll, which is very important, particularly because the city's now opened with this court twice, by making what is essentially an outrage argument. How could they pay themselves, which wasn't part of the judge's findings, $378 an hour, and then claim that they were underpaid? That's not what happened. That's not even close to what happened. It's not in the judge's findings at all. The number that they point to happened once, with all of the multipliers applying, on a holiday, strike detail, overnight, with a captain of the department working, and in that, as that was happening, Comptroller Ranigan was exchanging emails with the parking director within the city, essentially claiming the same outrage. How could they get these rates? Even though the rates are very specifically tied to the contract as the judge found it, and as it's been the case over the course of all of the 40 plus years. He exchanges this contemporaneous email, I believe it was in February 2020, with the parking director, talks about the rate, talks about his hostility towards the rate, but then confirms that it's accurate, and confirms that payroll was processed, that he never did not process the payroll, on the basis of it being inaccurate, specifically including the issues here. I wanna conclude, I see that I have about two minutes left, on one final point, and then if your honors have any questions, what's not mentioned one time, was mentioned once in response to a question today, I'm sure your honors reviewed the records thoroughly already but what I'd ask is, what's not mentioned once in any of the city's briefs, not once, is Mayor Howard's testimony, and Mayor Howard's December 11th, 2007 letter, which is literally a smoking gun in this case. Let me interrupt you, I'm just, I'm trying to think about something you said earlier. So, you're arguing that the police officers should be made whole for the public details as well, that there's, is that what you're arguing, that there's a... I do not believe that city details are part of... That the public rate is too low under the contract? It was part of our argument, we don't have an appeal pending before this court, but it was part of our argument before the lower court. I do not believe that the public details are included in the judgment.  which resulted in a defense judgment, which was not appealed. What's not mentioned one time is Mayor Howard's letter, which is exactly where this problem started, and then Mayor Howard's testimony at Record Appendix 651 to 653, where he says specifically, I put the 10% in place, I didn't check to make sure that it was being charged to the correct side, I didn't ask anyone to check that it was being charged to the correct side, and it wasn't being charged to the correct side. Your time's up, thank you. So the real purpose of the thrust of this action is to get the patrol, get the officers reimbursed for the 10% administrative fee, which should have been charged to the private parties, but was charged to the officers. That's correct, Your Honor. Okay. Thank you, counsel. At this time, Attorney Miller, you have a two-minute rebuttal. Please reintroduce yourself on the record Thank you. Barry Miller on behalf of City of Malden. I think that fundamentally, what we have here and the confusion that has come out in the discussion of this case is a failure to distinguish between what empirically happened in the calculation of the detail rate and what the contract required. Mr. Podolsky is correct that for a very long period of time, these officers were paid a rate set by the detail board, i.e. set by themselves, and they set it very high. The city did not intervene in that. This was a unilateral action by the detail board, which Captain Amaral was one of the folks who testified about. He testified that the calculation at issue was his calculation, and he never talked to anybody at the city about it. The city had no input into this rate or how it was calculated. Everywhere we see the testimony about this fully loaded rate, Mr. Ranigan and Chief Mollis are talking about the rate that was actually paid to the officers, similarly with the email exchange that occurred between Mr. Ranigan and the parking clerk. The parking clerk asks, what's the rate in effect? Mr. Ranigan told him what the rate was. He didn't check it. He wasn't saying this is what the contract requires. What he was saying is this is what these folks are being paid, and that's what Comptroller Ranigan testified to in the testimony that is the premise of Judge Young's conclusions here. Comptroller Ranigan testified, here's how it was calculated, but he also very specifically testified that's not how it should have been calculated under the contract, and that's what's missing from the analysis. I think we got that. The last point that Judge Selya just brought up, though, goes more to the issue of whether this is a wage claim. In other words, are they employees of the city for purposes of these details? Do you want to hit that quickly before your time is up? I would also like to add that this 10% issue that we've been talking about is also the subject of some confusion. The rate was decreased, the fully loaded rate was decreased by the detail board by 10%, but separately from that, the city charged a 10% administrative fee to private parties who requested these details and collected the administrative fee from the party it was supposed to be collected from. That's in the record and clear. In answer to your question, Judge Thompson, the services to issue implicates the fact that the details at issue, which are only private details, not city details, there is a mechanism by which the city can pull a detail to serve its own purposes. None of those are at issue here for the reasons that Mr. Podolsky explained. These are private details where a private party has come to the city and said, I need a police officer for a specific purpose. And ultimately, that private party is the one who pays the officer. They pay the money into the city and then the city pays the officer, but the money that is paying that officer for the services performed is the third party's money. And in that regard, it's very similar to the Gallagher v. Cerebral Palsy case. Essentially, when it comes to private details, the city is serving an administrative function in making police officers available when and where they are needed. And that's what the purpose- Is that money collected up front? It's collected when they pay the detail. So it's 10% that's added to each detail, each private detail. And so, for all of those reasons, these officers are really acting in the service of the entities that requested the detail. And for that reason, they should not be deemed to be providing services to the city and the Wage Act does not apply. Thank you. Thank you, counsel. That concludes argument in this case.